USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 7/12/19

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

ALLSTATE INSURANCE COMPANY,

                     Plaintiff,

-against-

HARTFORD INSURANCE COMPANY
OF THE MIDWEST,

                     Defendant.

17-Cv-7553 (SHS)

OPINION & ORDER

---

SIDNEY H. STEIN, U.S. District Judge.

This action arises out of a dispute between two insurance companies—Allstate Insurance Company ("Allstate") and Hartford Insurance Company of the Midwest ("Hartford")—about the payment of legal bills in a personal injury action involving an insured of both companies. The parties have cross-moved for summary judgment. Because Hartford was a co-primary insurer and voluntarily participated in the defense of its insured, it is obligated to contribute to the cost of the defense. Allstate can only recover, however, after it first reserved its right to contribution in August 2016. For the reasons that follow, Allstate's motion for summary judgment is granted in part and denied in part, and Hartford's motion for summary judgment is denied.

I. BACKGROUND

In August 2010, a motor vehicle accident occurred between Kenneth Couillard and April Clark. (Stipulation of Undisputed Facts ("Stip.") ¶ 1.) At the time of the accident, Clark was operating her mother Christine Comparetti's car to make a delivery on behalf of her employer, Women's Health Professionals, LLP ("WHP"). (*Id.*)

In September 2010, Couillard initiated a personal injury action against Clark, her mother, and, later, her employer. (*Id.* ¶ 5.) As is relevant to the defense of the *Couillard* litigation, both Comparetti and WHP had active

auto insurance policies when the accident occurred. (*Id.* ¶¶ 2–4.) Comparetti's policy from Allstate, for which Clark was an insured, had liability limits of $25,000 per person and $50,000 per occurrence. (*Id.* ¶ 2.) WHP had two insurance policies from Hartford. (*Id.* ¶¶ 3–4.) One policy had a liability limit of $1 million per occurrence (the "Hartford policy"), while the other had an umbrella liability limit of $10 million per occurrence (the "umbrella policy"). (*Id.*)

Initially, the insurance companies agreed to provide defenses to their respective insureds: Allstate to Clark and Comparetti, and Hartford to WHP. (*Id.* ¶¶ 6, 8.) Yet from August 2011 to April 2012, Hartford repeatedly sent letters tendering WHP's defense to Allstate, arguing that WHP qualified as an "additional insured" under the Allstate policy. (*Id.* ¶¶ 10, 12; Exs. F, G to Stip.) On June 29, 2012, Allstate finally agreed to defend WHP, stating in full: "This letter serves as confirmation that Allstate will provide Women's Health Professionals a defense for the above entitled claim." (Stip. ¶ 14; Ex. I to Stip.) During the representatives' subsequent correspondence about where to send defense counsel's invoices, there was no mention of any reservation of rights to reimbursement. (Exs. J, K to Stip.)

From that point forward, Allstate paid the law firm that Hartford had hired, Lewis Johs Avallone Aviles, LLP ("Lewis Johs"), at the rates Hartford had negotiated. (*Id.* ¶¶ 11, 15–16, 24.) Allstate also reimbursed Hartford for over $19,000 in defense costs that Hartford had incurred before the summer of 2012. (*Id.* ¶ 17.) During this period, Lewis Johs discussed WHP's defense in the underlying action only with Hartford; but Allstate was in no respect prohibited from participating in the defense and did not seek to assign the defense to new counsel. (*Id.* ¶¶ 18–20.)

Settlement talks were unsuccessful, and the ensuing jury trial resulted in an April 2016 verdict for Couillard that exceeded $12 million. (*Id.* ¶¶ 21–23.) The final judgment against Clark, Comparetti, and WHP was well over $13 million. (*Id.* ¶ 27.) In June 2017, WHP, with Hartford's separately retained appellate counsel, appealed the underlying judgment. (*Id.* ¶ 29.) Ultimately, the parties settled the underlying dispute in October 2017. (*Id.* ¶ 30.) In total, Allstate paid $834,683.64 in legal expenses. (*Id.* ¶ 31.)

By letter dated August 12, 2016—emailed to Hartford on August 16, 2016—Allstate requested that Hartford contribute pro rata towards WHP's past and future defense costs. (*Id.* ¶ 25; *see* Ex. N to Stip., at 2 ("Allstate's payment of any defense costs on behalf of Women's Health shall not be construed as a waiver of any right to reimbursement against Hartford. Allstate reserves all rights in law and equity to seek reimbursement for any past and future costs it has paid in connection with the defense of Women's Health.").) Allstate sought for Hartford to pay 97.5% of WHP's defense costs based on the policies' respective limits ($25,000 for Allstate and $1 million for Hartford). (Stip. ¶ 25; *see* Ex. N to Stip., at 2 ("Allstate requests that Hartford reimburse Allstate for its proportionate share (by limits) of the costs incurred to defend Women's Health, or 97.5% of the defense costs for Women's Health of past paid amounts and incurred amounts for trial and post-trial.").) Allstate also began to reduce its payments of Lewis Johs's invoices to 2.5% of the value of the invoices. (Stip. ¶ 25.)

In October 2017—the same month that the underlying case settled—Allstate filed the present action against Hartford seeking: (1) a declaratory judgment that Hartford provided coincidental primary coverage for purposes of the duty to defend WHP; and (2) an award of 97.5% of the defense costs incurred, plus interest. (Compl. ¶¶ 53, 65.) After engaging in limited discovery, the parties have now cross-moved for summary judgment.

## II. LEGAL STANDARD

On cross-motions for summary judgment, the Court considers each motion on its merits, drawing all reasonable inferences against the party whose motion is under consideration to determine whether a genuine and material fact dispute exists. *Utica Mut. Ins. Co. v. Clearwater Ins. Co.*, 906 F.3d 12, 17 (2d Cir. 2018); *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010). Sitting in diversity, the Court applies New York law, which both parties treat as controlling. *See Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) ("The parties' briefs assume that New York law controls, and such 'implied consent . . . is sufficient to establish choice of law.'" (citation omitted)); *see also Alphonse Hotel Corp. v. Tran*, 828 F.3d 146, 152 (2d Cir. 2016) ("Under New York

choice-of-law rules, 'where the parties agree that [a certain jurisdiction's] law controls, this is sufficient to establish choice of law.'" (citation omitted and alteration in original)).

### III. DISCUSSION

Because the parties offer competing perspectives on only legal questions rather than factual ones, summary judgment is proper. The primary issue at stake in the parties' cross-motions is whether Hartford became obligated to share in WHP's defense costs. In light of the terms of the Hartford policy and Hartford's participation in WHP's defense, the company triggered a duty to contribute to WHP's legal costs. Allstate's failure to reserve its right to contribution prior to August 2016 does not amount to an intentional waiver of its entitlement to reimbursement. The significant delay in reserving its right to contribution from Hartford, however, does limit the legal expenses which Allstate can recover.

### A. Hartford's policy terms and conduct triggered a duty to contribute to WHP's defense.

The parties' disagreement about Hartford's liability to contribute is, in short, a priority dispute. When determining which insurance coverage takes precedence in a priority dispute, courts first look to the policies' language to determine if the two policies cover the same risk. *Certain Underwriters v. Ill. Nat'l Ins. Co.*, 99 F. Supp. 3d 400, 404 (S.D.N.Y. 2015). If they do, then the priority or allocation of coverage turns on a comparison of the policies' "other insurance" clauses. *Emp'rs Ins. Co. of Wausau v. Harleysville Preferred Ins. Co.*, 726 F. App'x 56, 64 (2d Cir. 2018); *Certain Underwriters*, 99 F. Supp. 3d at 404; *see also Great N. Ins. Co. v. Mount Vernon Fire Ins. Co.*, 92 N.Y.2d 682, 686–87 (1999).

Where one "other insurance" clause provides for pro rata sharing of coverage (a pro rata clause) and the other deems its coverage excess to other valid insurance (an excess clause), the company that issued the former policy becomes the primary insurer. *Int'l Bus. Machs. Corp. v. Liberty Mut. Fire Ins. Co.*, 303 F.3d 419, 429 (2d Cir. 2002). Ordinarily, the primary insurer must pay for the insured's defense. *Emp'rs Ins. Co. of Wausau v. Gen. Star Nat'l Ins. Co.*, No. 03 Civ. 6575, 2004 WL 1555143, at *4 (S.D.N.Y. July 9, 2004);

4

*Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co., Inc.*, 16 N.Y.3d 257, 265 (2011). A carrier whose coverage is rendered excess via its "other insurance" clause does not have its duty to defend triggered until the coverage of the policy containing the pro rata clause has been exhausted. *L&B Estates, LLC v. Allstate Ins.*, 71 A.D.3d 834, 837 (2d Dep't 2010); *Sport Rock Int'l, Inc. v. Am. Cas. Co. of Reading*, 65 A.D.3d 12, 18–19 (1st Dep't 2009); *see Liberty Mut. Fire Ins. Co. v. Nat'l Cas. Co.*, 90 A.D.3d 859, 860 (2d Dep't 2011) (noting that the primary carrier's duty to defend ends when the insurance limits "have been exhausted by payment of judgments or settlements").

The parties agree that Allstate's coverage was rendered primary because that policy's "other insurance" clause took a pro rata approach for vehicles owned by the policyholder—such as the one operated by Clark—as follows:

> If an insured person is using a substitute private passenger **auto** or non-owned **auto, our** liability insurance will be excess over other collectible insurance. If more than one policy applies to an accident involving **your** insured **auto, we** will bear **our** proportionate share with other collectible liability insurance.

(Ex. A to Stip., at 45 (emphasis in original).) *Cf. Sport Rock*, 65 A.D.3d at 18 n.4 (citing a pro rata "other insurance" clause). In contrast, WHP's Hartford policy provided that its coverage would be excess to any other insurance for accidents—like the one here—involving cars not owned by WHP:

> For any covered "auto" you own, this Coverage Form provides primary insurance. For any covered "auto" you don't own, the insurance provided by this Coverage Form is excess over any other collectible insurance.

(Ex. B to Stip., at 156.) *Cf. Sport Rock*, 65 A.D.3d at 18 n.3 (citing an excess "other insurance" clause). The parties agree that Hartford's tender of WHP's defense to Allstate was appropriate, since WHP did not own the vehicle Clark was driving and thus Hartford's policy was excess to Allstate's policy.

5

Although they are under no obligation, excess insurance carriers may choose to participate in an insured's defense to protect their interests. *Preferred Constr., Inc. v. Ill. Nat'l Ins. Co.*, 494 F. App'x 162, 164–65 (2d Cir. 2012) (citing *Fieldston Prop. Owners Ass'n*, 16 N.Y.3d at 265); *Liberty Surplus Ins. Corp. v. Segal Co.*, 420 F.3d 65, 69 (2d Cir. 2005). However, taking on this responsibility may trigger a duty to defend. *See Gen. Motors Acceptance Corp. v. Nationwide Ins. Co.*, 4 N.Y.3d 451 (2005) ("*GMAC*").

In *GMAC*, a man took out a primary insurance policy from Nationwide Insurance Company for his leased vehicle. *Id.* at 454. The company from which he leased the car, GMAC, purchased two policies from Fireman's Fund Insurance Company: a primary policy, which had similar liability limits to the Nationwide policy, and an umbrella policy, which had much higher limits. *Id.* The coverage in the non-umbrella Fireman's policy was "excess over any other collectible insurance . . . ." *Id.* In a lawsuit following a collision involving the leased car, Nationwide initially provided for GMAC's defense. *Id.* at 454–55. However, Nationwide tendered the defense to Fireman's because the latter carrier had greater exposure given its umbrella policy. *Id.* at 455. Fireman's agreed to take over the defense, although it reserved the right to later collect defense costs from Nationwide. *Id.* After "vigorously defend[ing]" GMAC, Fireman's sued Nationwide to recover all of its legal costs. *Id.*

The Court of Appeals of New York required Fireman's and Nationwide to share—equally, due to their identical primary policy limits—the cost of GMAC's defense. *Id.* at 453, 457–58. The court provided a dual-rationale. First, the companies issued coincidental primary policies. *Id.* at 453, 456–57. Although the "other insurance" clause of the Fireman's policy rendered its responsibility to contribute to judgments or settlements excess, the limiting language did not extend to its duty to defend. *Id.* at 456. Second, Fireman's readily accepted Nationwide's tender and then provided GMAC's defense. *Id.* at 453, 455, 456. The court reasoned that where "two coincidental primary policies exist—one excess to the other by reason of competing 'other insurance' provisions" and both insurance companies "participated in the defense, they are both liable for the defense costs" in proportion with their primary policy limits. *Id.* at 453, 456.

6

Allstate contends that the decision of the New York Court of Appeals in *GMAC* is dispositive here, where Hartford's non-umbrella policy was co-primary and Hartford chose to exercise exclusive control over WHP's defense. Hartford disputes both conclusions, as well as *GMAC*'s reach.

### 1. GMAC *controls cases such as this one.*

As an initial matter, Hartford argues that GMAC's holding is limited to its specific facts—a proposition drawn from *Sport Rock International, Inc. v. American Casualty Co. of Reading*, 65 A.D.3d 12 (1st Dep't 2009). That case held that the primary insurance provider whose policy was rendered excess by an "other insurance" clause could be fully reimbursed for the costs expended in defending a mutually insured where the other primary insurance carrier, whose policy contained a pro rata clause, refused the tender of the defense. *Id.* 13, 16, 18, 29. In justifying its departure from *GMAC*, the First Department panel in *Sport Rock* determined that the Court of Appeals did not intend its decision to "control cases, like this one, that present significantly different circumstances." *Id.* at 24. In attempting to limit *GMAC*, *Sport Rock* took language of the Court of Appeals out of context: while *GMAC* stated that its holding was "only . . . under the circumstances of this case," that discussion was specific to the court's refusal to adopt an across-the-board rule requiring equitable allocation between insurers. 4 N.Y.3d at 457–58. Thus, this Court properly analyzes Hartford's non-umbrella policy and involvement in WHP's defense under the *GMAC* standard.

### 2. *The Hartford policy provided coincidental primary insurance.*

The parties disagree whether Hartford's non-umbrella policy can be characterized as a true excess policy or a primary policy rendered excess by an "other insurance" clause. "A true excess policy (such as the typical umbrella policy) is conditioned on the existence of an underlying primary policy, while a primary policy with an excess other insurance clause is a device by which a primary insurer seeks to limit[ ] or eliminate its liability where another primary policy covers the risk, thereby making it secondary coverage." *See Hartford Underwriters Ins. Co. v. Hanover Ins. Co.*, 122 F. Supp. 3d 143, 155 (S.D.N.Y. 2015), *aff'd*, 653 F. App'x 66 (2016) (citation omitted

7

and alteration in original). While *GMAC*'s applicability to the latter is clear, whether its holding can be extended to the former has not been established.

Like Fireman's in *GMAC*, Hartford issued two policies, only one of which is an umbrella policy. *GMAC*, 4 N.Y.3d at 454. (Stip. ¶¶ 3–4.) And the Hartford and Fireman's non-umbrella policies used nearly identical language to discuss their primary and excess coverage of owned and non-owned automobiles, respectively. (*Compare* Ex. B to Stip., at 156, *with* Ex. A to Decl. of Matthew C. Ronan, at 47 ("For any covered auto you own this policy provides primary insurance. For any covered auto you don't own, the insurance provided by this policy is excess over any other collectible insurance.").) Hartford attempts to distinguish the primary policy at issue in *GMAC* in the same way that *Sport Rock* did—namely, that the excess clause at issue here has a narrower scope than the Fireman's clause at issue in *GMAC* because it only applied to non-owned cars. *See Sport Rock*, 65 A.D.3d at 24 (finding a meaningful distinction to the Fireman's policy in *GMAC* that the *Sport Rock* policy's "other insurance" clause only rendered excess coverage "a particular class of risks"). Based on the fact that the Hartford and Fireman's "other insurance" clauses are substantively indistinguishable, this argument fails. Moreover, Hartford has admitted in another action involving identical "other insurance" clause language that such a policy is not a "true excess policy." *Hartford Underwriters*, 122 F. Supp. 3d at 155 ("According to Hartford, . . . it is undisputed that both policies at issue here are primary, and only excess with regard to nonowned autos by virtue of their 'other insurance' clauses, rather than 'true excess' policies, . . . ."); *see id.* at 147 (quoting the Hartford policy's "other insurance" clause).[1] The Court agrees with Allstate that Hartford's policy provided coincidental primary insurance that was rendered excess to primary coverage by its "other insurance" clause.

---

[1] Hartford Insurance Company of the Midwest and Hartford Underwriters Insurance Company are both subsidiaries of The Hartford Financial Services Group, Inc. *See Legal Notice*, THE HARTFORD (2019), *available at* https://www.thehartford.com/legal-notice. (Rule 7.1 Disclosure; Ex. G to Elsa J. Schmidt Affirmation.)

8

### 3. *Hartford voluntarily participated in WHP's defense through its involvement in litigation strategy.*

The second factor under *GMAC* is whether Hartford chose to participate in defending WHP. Although the parties quarrel over whether Hartford exercised exclusive "control" over the defense, there appears to be no genuine factual dispute that—consistent with *GMAC*—"each participated in the defense." 4 N.Y.3d at 456. Hartford selected WHP's counsel, set the rates of payment, and alone played a role in WHP's litigation strategy. (Stip. ¶¶ 11, 16, 19–21, 29; Aff. of Joan M. Canny ¶ 4.) Allstate fully paid defense counsel's bills over nearly four years, reimbursed Hartford for earlier legal expenses, and was never excluded from participating in the litigation on WHP's behalf. (Stip. ¶¶ 17, 18, 20–21, 24; *see also* Decl. of Maureen Fahey ¶¶ 27–29.) Unlike in *Sport Rock*, where the carrier only defended the insured after its tender was "rebuffed," 65 A.D.3d at 23, both Allstate and Hartford voluntarily took part in WHP's defense. *See Nat'l Union Fire Ins. Co. of La. v. Universal Fabricators, Inc.*, 713 F. Supp. 2d 206, 213–14 (S.D.N.Y. 2010) (quoting "New York law" as establishing that an "insurer becomes a volunteer" when it unmistakably "assumes the defense and indemnification of an insured when there is no obligation to do so" (citation omitted)).

\* \* \*

In sum, because the Hartford policy was a primary one rendered excess—rather than a true excess policy—and because Hartford participated in WHP's defense, it must share pro rata in defense costs.

### B. Allstate has not waived its right to seek contribution, but it may only recover for defense costs that were incurred after first asserting this right.

Hartford argues that Allstate has waived any right to have Hartford contribute to the defense costs because Allstate did not assert its right to receive contribution until August 2016. In the insurance context, a contractual right may be waived by knowing, voluntary, and intentional abandonment of that right. *New York v. AMRO Realty Corp.*, 936 F.2d 1420, 1431 (2d Cir. 1991); *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset*

*Mgmt., L.P.*, 7 N.Y.3d 96, 104 (2006). To demonstrate waiver, a party must marshal evidence of *affirmative* conduct or a failure to act that demonstrates an *intent* to forgo the contractual right. *Id.*

In Hartford's view, Allstate's full payments to the preexisting legal team between August 2012 and March 2016 (Stip. ¶ 24)—without qualifying that it might later seek contribution—amounts to waiver. Yet, Allstate did eventually state that it intended to pursue contribution. (Ex. N to Stip., at 2.) Given this clear expression of its intent to later seek reimbursement, Allstate's payment of defense costs, standing alone, is insufficient to establish waiver. *See N. River Ins. Co. v. Duro Dyne Nat'l Corp.*, 153 A.D.3d 844, 847 (2d Dep't 2017) (finding no waiver despite insurers' payment in full of defense costs for 20 years).

That there was no waiver, however, does not mean that Allstate can recover pro rata for the entirety of the defense costs incurred over years of silence. Allstate searches for support in *GMAC*, which required Nationwide and Fireman's to split all defense costs. 4 N.Y.3d at 453. But *GMAC* provides no comfort, because there, Fireman's reserved its right to seek reimbursement *at the time* it accepted the tender of the insured's defense. 4 N.Y.3d at 455, 456–57. Allstate argues that it did not need to reserve its right until August 2016, when it realized that the equities between the two carriers were imbalanced and that Hartford was acting in its self-interest. Yet, Allstate had long been aware that Hartford had far greater exposure due to the higher limits of its policies and that Hartford was the driving force behind WHP's defense. Because Allstate acquiesced—without any reservation—in fully funding WHP's defense for most of the underlying litigation, Allstate may only recover for legal expenses incurred after it first reserved its right to contribution in its letter of August 12, 2016. *Cf. Liberty Ins. Underwriters v. Arch Ins. Co.*, 61 A.D.3d 482, 483 (1st Dep't 2009) ("Defendants . . . are not entitled to reimbursement of defense costs incurred before tendering the defense to plaintiff . . . ."); *Bovis Lend Lease LMB, Inc. v. Royal Surplus Lines Ins. Co.*, 27 A.D.3d 84, 94 (1st Dep't 2005) (only requiring reimbursement for defense costs incurred after the underlying lawsuit was tendered).

10

## IV. CONCLUSION

WHP held a co-primary policy from Hartford that was rendered excess by its "other insurance clause." Although Hartford did not initially have a duty to defend its insured, Hartford triggered a contribution obligation by actively participating in WHP's defense. Having expressed its intent to recover costs from Hartford in its August 12, 2016, letter, Allstate has not indicated an intent to relinquish its right to contribution. However, given its significant delay in asserting this right, Allstate may only recover legal expenses incurred after August 12, 2016, at a rate proportional to the primary policies' limits. Hartford's motion for summary judgment is denied, and Allstate's motion for summary judgment is granted in part and denied in part.

Dated: New York, New York
July 12, 2019

SO ORDERED:

Sidney H. Stein, U.S.D.J.